## No. 5441.

MRS. EMILY L. HART ET AL. VS. ST. CHARLES STREET RAILROAD COMPANY.

When the charter of a corporation provides that in case any subsequent increase of the capital of the concern is authorized, notice of sixty days shall be given of such increase, within which time the stockholders shall have the privilege of taking additional shares, proportioned to the amount of their stock, and that any shares, not taken at the expiration of that time, may be disposed of by the directors for the benefit of the association,

*Held*—That in order to entitle a stockholder to demand said additional shares, it must appear that he applied for the shares, and paid over or tendered the money, necessary to purchase the same, before the expiration of the sixty days; or before the expiration of any additional delay, which may have been given by the corporation to enable the stockholders to exercise said privilege.

APPEAL from the Sixth District Court, parish of Orleans. *Saucier*, J.

*Finney & Miller*, *John H. New*, and *E. E. Moïse* for plaintiffs and appellants.

*Breaux, Fenner & Hall* for defendants and appellees.

The opinion of the court on the original hearing was delivered by SPENCER, J., and on the rehearing by MANNING, C. J.

SPENCER, J. Plaintiffs owned, as surviving widow and heirs of Henry Hart, who was one of the original corporators of the defendant railroad, 818 shares of its capital stock.

The eighth article of the charter of said company is as follows :

"These articles of association may be modified or altered, and the capital stock may be increased to any sum not exceeding two millions of dollars, in the manner provided by law, with the consent of two thirds in amount of all the stockholders, obtained in general meeting convened after thirty days' notice. Whenever any increase of capital shall be duly authorized, sixty days' notice shall be given in two newspapers published in the city of New Orleans, within which time stockholders shall have the privilege of taking additional shares in proportion to the amount of their stock, and any shares not taken at the expiration of that time may be disposed of by the directors, for the benefit of the association, but at not less than par value."

In accordance with said article the capital stock of the company was increased on August 5, 1873, $100,000, in shares of $50 each.

Notice to the stockholders was duly published for sixty days, to the end that they might exercise their " privilege of taking additional shares in proportion to the amount of their stock."

On September 29, 1873, the board of directors passed a resolution " that the time for *subscription* to the stock authorized to be issued," etc., " be extended thirty days, and interest at the rate of eight per cent per annum be added after October 4, 1873." Notice of this extension was duly published by the secretary, who substituted the words " payment for," in lieu of the words " subscription to " the stock.

On November 3, 1873, the board of directors again passed a resolution extending " the time for the *subscription* to the stock " until November 15, 1873.

Notice of this extension was also published by the secretary, who again substituted " payment " in place of " subscription."

It is admitted on all hands that no particular form or manner was prescribed for " taking " or " subscribing to " this stock by the original stockholders. Being subscribers to the original stock, and under the charter entitled to the privilege of " taking " the new stock in proportion to the stock already held by them, no subscription book would seem to have been necessary, or was used.

Plaintiffs claim that, as owners of the 818 shares of the original stock, they were entitled, under the charter, to take 163 shares of this new stock, at par. That they had, in due time, signified their intention to exercise their privilege to do so, and had accordingly tendered the amount necessary to pay for their said shares. That the president and directors unlawfully refuse to issue and deliver them the certificates for said stock, or to recognize their right thereto.

The defendants answer in substance, that the privilege claimed by plaintiffs is, by the charter, expressly limited to sixty days from date of publication of notice to the stockholders of the increase of stock; that the stock can not be taken without payment being made for the same; that plaintiffs failed to take the stock covered by their privilege within the time limited, or any authorized extension thereof, but, on the contrary, admitted their inability to take and pay for the same within said period, and only made a tender of the money after said delay, and all extensions thereof, had expired; that thereby their said privilege was forfeited, and the stock to which plaintiffs would have been entitled became the property of the association.

There was judgment for defendant, and plaintiffs appeal.

We find the facts to be as follows: 359 shares of this new stock had never been issued or disposed of by the company. On the fourteenth

November, 1873, the day before expiration of the last extension, the plaintiff, Mrs. Hart, representing herself and children, went to the president and notified him *verbally,* at the office of the company, that she claimed her privilege of taking 163 shares of the new stock, and would be prepared to pay for it within two or three days. She was told that she had delayed too long, and given to understand that she could not "take" the stock unless it was paid for at once, although no such requirement was found in said resolutions; and although, so far as we can see, the board of directors had never, by any formal action, imposed such restriction upon the right of subscription. She persisted, and on the twenty-second November made a formal tender of the money, and demand for the stock, which was refused. Thereupon she brought this suit.,

There is and can be no dispute that plaintiffs had the privilege, within sixty days after publication of notice, of " taking " 163 shares of this stock, at par. We think it also clear that under the charter the board of directors had the power to extend the time for " taking " this stock; and that the board did, in point of fact, *extend that time to November* 15, 1873, by passing resolutions extending the time "for subscription" thereto. We think, also, that the words "taking stock," and "subscription to stock," in their ordinary use and acceptation, are synonymous, and mean practically the same thing. *The board of directors, in this case, manifestly so understood it,* for in their resolutions for extension they say the "*time for subscription*" is extended. Of course the secretary could not, by any authority he had, substitute " payment" for " subscription," unless they mean the same thing. We do not think that the usage or etymology of these words make them synonymous. We know that, in point of fact, in transactions of the nature of these we are considering, the " subscription to," " the taking of," the stock most generally, if not always, precedes any payments. The payment is *the consequence* of " the subscription," of " the taking." When we are told that a man has " subscribed to " or " taken " stock, we understand that he has agreed and bound himself to take and pay for it—not necessarily or *even usually* that he *has paid* for it. So that there remains to discuss the two questions: First, did the plaintiff's acts and declarations on the fourteenth November amount to a subscription, i. e., to an agreement on her part to take the stock, and if so, second, did she forfeit her subscription by failing to tender the money on or before the fifteenth November?

In our opinion the first of these questions must be answered in the affirmative, and the second in the negative. The legal status of affairs was this: The company, by its directors, had formally offered to its stockholders the privilege of " subscription " to its stock at par until

fifteenth November *without* specifying *any particular mode* of subscription, or fixing *any special conditions thereto*, except the payment of eight per cent interest from October 4. Plaintiff clearly had the right, up to November 15, "to subscribe," to accept this offer, so tendered. She did accept it verbally—no other way being prescribed—and thereby became bound by its terms; and she must be considered as having subscribed for 163 shares on the fourteenth November; and when we say she had the right *to subscribe* we do not mean that she had a right to require the delivery of the certificates of stock before payment. Here, we think, is the capital error in defendants' argument: it consists in *confounding the right to subscribe*, with *the right to delivery and possession of the stock*. Having subscribed, she could only be put in default by *a formal* tender and demand for payment. There is no pretense that such tender and demand were ever made. Hence the question as to whether she forfeited her rights by non-payment does not arise, since she was not put legally in default.

We conclude, therefore, that plaintiff's demand is well founded, and, therefore, that the judgment appealed from should be reversed.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be reversed and set aside ; and it is now ordered and decreed than plaintiffs are entitled to 163 shares, of fifty dollars each, of the new and increased stock of the St. Charles Street Railroad Company, directed to be issued by resolution of the company, of date July 28, 1873, together with all dividends accrued thereon, and that said plaintiffs be decreed owners of said shares, and that said company issue to them certificates therefor, upon said plaintiffs paying to said company fifty dollars per share for said stock, with eight per cent interest from October 4, 1873. It is further ordered that defendants pay costs of both courts.

---

### CONCURRING OPINION.

MARR, J. In my opinion, by the terms of the charter of the defendant company, article eight, the stockholders had the right in preference to all other persons, during the prescribed delay, to take shares in the increased stock, in proportion to the shares of original stock owned by them respectively: and, as no new subscription or other special formality was required for the taking of such new shares, the declaration by a stockholder to the representatives of the corporation within the prescribed delay of his intention to avail himself of this right and privilege would constitute a taking of the designated number of shares in the new stock, an acceptance by the stockholder of the benefit, the offer made by the corporation to each stockholder, as required by the charter,

which would authorize the corporation to treat and deal with him as a stockholder, to the extent of the new shares as well as the old shares, and would compel the stockholder to pay the par value.

In the several resolutions of the Board of Directors the word "payment" does not occur; and the secretary had no power to bind the stockholders by using the expression "the time for the *payment* for the stock," instead of the words "*taking* additional shares," as used in article eight of the charter; or those used by the board of directors, "the time for the *subscription* to the stock."

As I understand the testimony the stockholders who availed themselves of this right to take the additional shares did not, in fact, make any new subscription. They paid for the shares, and certificates were delivered to them. I do not find in the proceedings of the Board of Directors any thing to fix the terms of payment for the new shares. I do find, however, that interest, at eight per cent was charged on payments subsequent to the fourth of October, 1873.

The fourth article of the charter provides, with respect to the original stock, that "thirty-five *per cent* of each subscription shall be payable at the time of signing the articles; and the remainder shall be paid at the time and in the manner directed by the Board of Directors: *Provided*, that not more than ten *per cent* of said subscription shall be called for at any one time, and not oftener than once within any thirty days."

If it be conceded that when the increase of the capital was authorized the directors were empowered to prescribe terms and times of payment for the new shares, different from those fixed in the fourth article of the charter, the intention to do this, and the carrying that intention into effect, must be manifested by the official, unequivocal, positive action of the Board; and that when the Board of Directors failed to fix the time, it was not competent for the secretary to do so.

In the absence of official action by the Board, prescribing different terms, making a new law applicable to the new shares, they would fall under the dominion of the organic law, article four, and would be subject to the restrictions which it imposes. I do not see how the mere increase of the capital could subject the stockholders, with respect to the new stock, to conditions not imposed by the charter or by-laws; or by some authoritative order of the Board of Directors; or could abrogate the law of the corporation limiting the power of the Board to calls of ten *per cent*, to be made not oftener than once in any thirty days.

I think, also, that this fourth article controls the action of the Board with respect to the additional capital in another particular. It provides that if any subscriber shall fail to pay punctually his installments as they mature and fall due, interest shall be charged at eight *per cent;*

and if he fails to pay within thirty days after the specified time of payment the Board of Directors may cause his shares to be sold, at auction or otherwise, after ten days notice by advertisement.

Mrs. Hart actually tendered, on the twenty-second November, in money, the whole amount of the par value of the additional shares to which she was entitled. This was, of course, a waiver by her of any right which she might have claimed under article four to pay in installments, but after having demanded the right to take the additional shares, the corporation had no right to deny her the privilege conferred upon her by the charter, article eight, without, at least, putting her in default, by a tender of the certificates, and demand of payment. It seems to me the Board could have proceeded, legally, only by a sale, for her account and at her risk, of the new shares to which she was entitled, as provided in the fourth article of the charter.

The cases cited from High and 11 Annual are applicable to cases of original subscriptions to stock. There can be no doubt that the taking of stock must be in such form as to bind both parties, the corporation to deliver the shares, the taker of the stock to pay the par value. I understand the eighth article of the charter to mean that, whenever the corporation shall exercise its right to increase the capital, the corporation, by the terms of the charter, makes in its aggregate capacity an offer to each stockholder, to take, during a certain prescribed delay, such number of shares in the increased capital as shall correspond with the number of shares of the original stock which he already owns: and that when a stockholder declares his intention to avail himself of this right, this is an acceptance by him of the offer; which binds him and binds the corporation.

Whenever the corporation, pursuant to its organic law, increases its capital, without changing that law with respect to the increase, the new stock falls under the dominion of the organic law, and is not distinguishable, and is not distinct from the original stock.

The case of the Vicksburg, Shreveport, and Texas Railroad Company vs. the Parish of Ouachita, 11 An. 649, is not, in my opinion, applicable to this case. The police jury of Ouachita, by ordinance of twenty-seventh June, 1853, agreed to subscribe for a certain number of shares in the V. S. and T. R. R. Co. and levied a tax to make the necessary payments. The railroad company sued the parish to compel the payment of the installments due on the number of shares mentioned in the ordinance.

It appeared in evidence that the president of the police jury notified the president of the railroad company that this ordinance had not been ratified by the vote of the majority of the voters whose property was to be taxed to meet the installments: that this ordinance had been

suspended by a subsequent ordinance of the police jury: that the ordinance of twenty-seventh June, 1873, had not been passed by a majority of all the members elect of the police jury, as required by the act of 1847, page eighty-two, section 5; and that no subscription, or signing, by the police jury had been made, as required by the express provisions of the charter of the railroad company. Of course, as the court decided, "the assurance of the tax-payers, evidenced by a vote, was a *sine qua non.* The inevitable conclusion was that there was no contract binding the parish to the validity of the subscription, by the terms of the statute."

The difference between that case and this is too plain to require exposition. In that case there was no contract binding both parties: In this there was : In that case the subscription by signing, on lists in the hands of commissioner, or upon stock books of the company, was indispensable; while in this case, as we have endeavored to show, no new subscription was made or required.

I concur in the opinion of Mr. Justice Spencer, and in the decree as pronounced by him.

---

### Dissenting Opinion.

Egan, J. In my opinion, the original stockholders who desired to subscribe for additional stock under the resolution of the board, stood, so far as the *mode* or *manner* of *subscription* is concerned, on precisely the same footing as any other person proposing or desiring to subscribe, the only difference in their favor being that original stockholders had an absolute right to subscribe to shares of the new stock in proportion to that already held by them *within a certain time*, and that other persons had not that absolute right, but, however desirous to subscribe, might have been denied the privilege of doing so by the officers of the corporation at any time that they might have chosen to withdraw the stock from sale, or indeed not to offer it at all.

If what was done and said by the plaintiff amounted to a subscription on her part, the same or similar acts and declarations on the part of another who had never been a stockholder, would have had the same legal effect so far as relates to the mere manner of making a subscription. In other words, if the stock was offered for sale generally to all persons, it would have required nothing more on their part to make a good and binding contract than was required of plaintiff, to whom, and to others in like situation, it was offered within the sixty days. This proposition will hardly be questioned, and can not be successfully denied. Nothing which would not constitute a valid contract or obliga-

tion on the part of another, could constitute one as to the plaintiff. The mere expression of her willingness or desire to take stock, or to make a further subscription, even if unaccompanied by any conditions, can not be considered as amounting to a subscription in any proper or legal sense of the term. That Mrs. Hart so understood at the time, is manifest from her asking further time to raise the money, that she might make her subscription, or take stock, after the time fixed by the charter, and the resolution of the board of directors. That such was the view taken by both parties at the time is evident, both by her application for the extension of time, and the refusal of the president to grant it.

Indeed, by her own showing, Mrs. Hart was *without power* to take the stock at the time, and had to await the action of a family meeting, and the order of the judge to enable her to do so. Even the power to subscribe was not conferred till after the expiration of the time within which the right was to be exercised. There was ample time to obtain this authority sooner, and within the sixty days. If it was not done, it was certainly not through the fault or neglect of the defendant. Suppose it had never been obtained at all, and that from decline in value of stock, or for some other reason, Mrs. Hart had stopped short in her efforts to obtain the advice of the family meeting, and order of the judge, or that they had refused to give it, could the subscription have been enforced by the company? To this there can be but one answer— that it could not.

It is conceded by plaintiff's counsel, indeed by both counsel, that no specific mode of taking this new stock was prescribed, and that no custom or usage of this or of similar corporations has been shown in evidence. In the absence of either, we are remitted to the general principles of the law of obligations to interpret the acts and language of the parties to this alleged contract, and their legal effect—as was said in the case of the Vicksburg, Shreveport, and Texas R. R. Co. vs. the Parish of Ouachita, reported in 11 A. 649. "Giving full weight" to the acts and language of the plaintiff, Mrs. Hart, "they can not be considered as constituting *per se* a subscription to the capital stock" of the defendant. It was at most only a proposition to contract, and upon terms different from those fixed in the charter, and the resolution of the board; but, in my opinion, it did not amount to so much, but only to an expression of desire to subscribe.

Redfield, on the Law of Railways—vol. 1, p. 128, sec. 37, par. 1, fourth edition—says: "The obligation resting upon the vendor of railway stock is to have, at the time specified in the contract for delivery, a good title to the requisite number of shares, and to manifest his readiness to convey;" and in par. 2 of same section: "The corresponding

obligations upon the vendee are, readiness to receive the proper conveyance (for which read stock) at the specified *time* and *place*, and to pay the price;" and, in note 4 of p. 131, cites Green vs. Murray, 6 Jur. 728, to the effect that "if stock is to be delivered on demand, it is necessary to show an actual request to deliver, in order to sustain an action for nondelivery." It may be conceded that a perfectly valid subscription may be made without payment at the time, provided any other mode of subscription is provided for or practiced; and in such case the terms subscription and payment would be by no means synonymous, and the latter might not be a prerequisite to the former. The plaintiffs' case assumes the obligation on their part to pay the par value of the stock in money. Our own Civil Code provides, article 2050, that "when no time is fixed by the parties for the performance of the obligation, it may be executed immediately, unless from the nature of the act a time either certain or uncertain must be implied. Thus, an obligation to pay money, without any stipulation for time, may be enforced at the will of the obligor." In this instance no other mode of subscription, or taking of stock, than by paying money for it existed, and the will of the officers, through whom alone the corporation could and did act, was not only made manifest that the price must be at once paid, but, in my opinion, the president had no power to comply with the plaintiff's request, and grant her further time after the lapse of sixty days. To do so he would have assumed to confer a right upon her upon terms and at a time different from that fixed in the charter and the resolution of the board. I think the interpretation of that resolution given by the secretary in his advertisement was the proper and legal one, and it is evident that both the president and the plaintiff so thought at the time.

"A proposition does not become an agreement till the party to whom it is made accepts it; and it must be accepted precisely as made." McDonough vs. Winchester, 1 L. 188. "The acceptance, to form a contract, must be in all things conformable to the offer; any condition or limitation contained in the acceptance, of that which formed the matter of the offer, gives him who makes the offer the right to withdraw it." C. C. 1805.

"The contract consisting of a proposition and the consent to it, the agreement is incomplete until the acceptance of the person to whom it is proposed." C. C. 1800. "This assent must be unqualified." C. C. 1801. "The will of both parties must unite on the same point." C. C. art. 1798. "Any modification or change of the proposition is considered as a new offer." C. C. 1806. "A consent to give any thing else, although of greater value than that contained in the offer, *or to give the same or a larger sum at a different time of payment, does not imply an assent to the offer, and there is, in that case, no obligation.*" C. C. 1808. "A subscrip-

tion for shares of stock is nothing more than a purchase or sale of stock, and the seller is not bound to make a delivery of the thing if the buyer does not pay the price, and the seller has not granted him any time for the payment." C. C. 2487. "In commutation contracts, where the reciprocal obligations are to be performed at the same time, or the one immediately after the other, the party who wishes to put the other in default must *at the time* and place expressed in or implied by the agreement offer or perform that which, on his part, was to be performed, or the other party will not be legally put in default." C. C. 1913. "And though the contract be not commutative, or if commutative, the reciprocal obligations are not to be performed at the same time, yet the party wishing to put the other in default must be himself ready, and must offer to receive performance at the time and place stipulated in the contract, and he can not avail himself of any demand, or offer, at any other time or place." C. C. 1914. "An offer afterward comes too late." 19 A. 84; 20 A 505; same 291. "He must show both his readiness and ability to comply with his own obligation." 15 A. 675. The case cited from 11 A. of the Railroad Company vs. the Parish of Ouachita was a much stronger one than the plaintiffs'. There the police jury of Ouachita had, in pursuance of an act of the Legislature conferring the power, passed an ordinance which had been submitted to and ratified by the qualified voters providing for a subscription to 6000 shares of the stock of the railroad company, which, by a formal resolution of its directory, had accepted the ordinance as a subscription of stock, and sought to enforce it as such, and yet the court said, considering it as an ordinance legally adopted: "We can not consider its adoption as constituting *per se* a subscription to the capital stock of the company." The same principle is recognized in High's Ex. Legal Remedies, sec. 390, and p. 275, where it is announced in the text, and several decisions of other States quoted in support of the position, that a mere vote of municipal electors authorizing subscription to a railroad corporation, without the actual subscription by the officers of the corporation, is insufficient, and that mandamus will not lie in aid of the railroad to compel the officers to make subscription. The writer says the mere vote of the people authorizing subscription does not of itself constitute a contract with the railway; nor is it a proposition which can ripen into a contract upon the performance by the railroad of the conditions annexed to the vote; and "until the money is actually raised and the stock taken" it is no contract. If that be so on the one hand, is not the converse of the proposition equally true, and could the railroad company be compelled to issue the stock? To this there can be but one answer, in the negative. This shows that something more is required to constitute a subscription than a mere expression of willingness or purpose to make it; and it

would seem that even a mutual consent is insufficient, which was wanting in the case at bar, as those alone through whom the defendant company could speak gave no consent. I venture the assertion that no subscription or stock was ever before successfully claimed on so slender a basis, and certainly that no such mode of subscribing or taking stock was ever practiced with or by any corporation.

. For the foregoing reasons I dissent from the conclusions of a majority of the court.

DeBLANC, J. I concur in the dissenting opinion of Mr. Justice Egan.

---

## ON REHEARING.

MANNING, C. J. Whenever any increase of the capital of the defendant Company was authorized, notice of sixty days must be given, within which time, stockholders had the privilege of taking additional shares, proportioned to the amount of their stock. Any shares, not taken at the expiration of that time, might be disposed of by the directors for the benefit of the association.

The increase of the capital stock was authorized August 5, 1873, and notice was given of it. The time, within which the stockholders had the privilege of taking additional shares, expired on October 4th. A few days before that date, the Directors by resolution extended the time thirty days, i. e. to November 3d.

During this period of ninety days, the plaintiff neither took, subscribed, nor indicated a willingness, desire, or intention to take or subscribe the additional stock.

On Nov. 3d, the directors again extended the time to the 15th. of that month. On the 14th., the plaintiff went to the office of the Company, and verbally notified its President that she claimed her privilege of taking the additional shares of stock, and that she *would be* prepared to pay for them in two or three days. She was told that payment in two or three days would not answer—that the last extension of time expired on the morrow, and unless payment was made within that time, she could not have the additional stock. She made no payment, and tendered none then. On the 22d of that month she made a formal tender of the money, necessary to pay for her shares.

I think she was too late, and I use the singular pronoun, because the change of my opinion changes our decree. I do not base this upon any supposed or real identity of meaning of the words, 'take' and 'subscribe to', when used in reference to such a matter as this, nor upon the idea that either of these words means, or is synonymous with, 'pay for.' Neither do I attach any importance to the use by the Secretary of

Hart vs. St. Charles Street Railroad Company.

terms, different from those appearing in the resolution of the Board of Directors. He could not change the action of the Board by adopting phraseology, not authorized by it.

Throwing aside verbal criticism, and inquiring solely what the parties must have understood by the articles of association, by the resolutions of the Board providing for an increase of stock, and for the time and manner in which the privilege of taking additional stock should be exercised, we think the attempt of the plaintiff to avail herself of this privilege was properly frustrated.

Why should the Directory have extended the time beyond the sixty days for taking or subscribing for the stock, if it was only designed to give parties an additional thirty days to say whether they would take it? Why should parties need additional time to say whether they wanted additional stock, if saying was the only thing to be done. The stock had become valuable. The original subscribers had carefully guarded their right to additional stock, proportioned to their original subscriptions, if an increase should ever be authorized. It was secured to them as a privilege. Each one would presumably desire to avail himself of this privilege, but every one might not be prepared to pay for the stock at once. The sixty days was given, and must have been given, not as a period of deliberation for each one to determine whether he would avail himself of this privilege, but as a period of preparation so that he could avail himself of it.

So too of the extension of thirty days beyond the time first accorded, and then, in order to afford another and last opportunity, a further extension of fifteen days was granted—evidently for the purpose of enabling parties to do something else, and something more, than merely declaring that they would take the stock, and pay for it when the condition of their finances permitted. It required no delay, and no extension beyond the sixty days fixed by the articles as the time of notice, to enable parties to say that.

It was not until the last day of the last extension that the plaintiff verbally notified the Company of her intention to take the additional stock, and when expressly informed then that she must pay within the time of the last and third extension, made no effort to comply with that just requirement. It was not until seven days after the expiration of the last extension that a formal tender was made of the money. Her rights were then lost. Therefore

It is ordered and adjudged that our former decree is annulled and set aside, and that the judgment of the lower court is affirmed with costs.

SPENCER, J. I dissent for the reasons stated in the original opinion.

MARR, J. I adhere to the opinion rendered in former hearing.

49

Egan, J.  I adhere to the views of this case presented in the dissenting opinion prepared by me when the case was first before us.  That opinion was, however, prepared without having the record before me at the time, and I was thus led into a possible error of fact which does not affect the principles of the opinion, but which, while it strengthens the view of the case I then took, I still prefer to notice.  I refer to the fact that instead of the terms of subscription being certainly as they would ordinarily be in law, cash, in the absence of mention of a time being given for payment, subscribers for the new stock were required to pay eight per cent interest after the expiration of the sixty days given by the terms of the charter.  This either means, and I still entertain that view, cash, with the addition of interest calculated from that time to the time of taking the stock, or, at most, a credit of sixty days more upon condition of paying eight per cent interest on the amount.  Either view would exclude all right in the plaintiff, who had assumed no obligation capable of being enforced in law to pay the eight per cent conventional interest of which nothing but written evidence is receivable under our law, C. C. art. 2924, and who therefore had no conveying right to the stock.

I concur in the decree against the plaintiffs' rights and in favor of defendants.